All right, thank you everyone. Our third case this morning is Jessica Biggs v. Chicago Board of Education. Good morning, Your Honor. May it please the Court. This case involves an occupational liberty interest claim by Ms. Biggs against the Chicago Board of Education. I think it's important to note at first that the occupational liberty interest claim is, this is a quintessential case in many respects. The quintessential case of an occupational liberty interest claim is that situation where a government blacklist effectively precludes an individual from their desired occupation. Now, here, this does involve a limited blacklist, the D&H designation, but it also involves statements that were made that stigmatized Ms. Biggs publicly and enhanced the effect of both that blacklist and the circumstances and statements that were made surrounding her termination. Counsel, one of the facts that you point to to support the notion that the board's actions excluded Ms. Biggs from her profession or her occupation is the fact that she searched for principal jobs outside of Chicago in the summer of 2018 and found none. Well, if none was available, how does that support an argument that the board's actions acted to exclude her from those jobs? Well, I think that her job, her occupation, the scope of what we're talking about here, isn't just the principals, and we're not limiting it to that. It's administrators of any kind in education. To the point that we've raised… But again, you said she looked for those types of jobs outside of Chicago in the summer of 2018, but none were available because they were all filled for the upcoming fall year. And so I'm still trying to understand how that supports the notion that the board's actions were what excluded her from those occupations. I think to the extent that we cited in the brief, it was in response to the board's argument, where they say that she didn't apply for any principal positions. And our response is that there weren't any to apply for. This isn't a situation like Black Seal Coding, where there's an allegation that they were excluded from any bids that the city had to offer. There were bids out there that they could have bid on these projects and tried to get these projects, and they just didn't do that. This isn't that case. This is a case where, as far as principal positions go, there weren't any available. Just for the short period of time that she was looking, there weren't any available. That's a very short measure of the supposed stigmatizing effect of the D&H designation and the other public comments that you're challenging here. I agree, but it's not the only—that is a limited period of time. After that, we filed this lawsuit, and she's continued to look. But that isn't the only effort that she made in order to find a job in administration, although that period of time was brief, where she was actually looking for principal positions, because after the start of the school year, the presumption was that there just aren't going to be very many open administrative positions, including principal positions at that point. The disclosure by the board was twofold. It disclosed that Ms. Biggs failed to follow policy, which your client agrees with. And according to Ms. Biggs, the board also disclosed that she lacked integrity. But how do we know whether she had trouble getting another job because of the revelation that she failed to follow policy or because of the disclosure that she lacked integrity? It is possible. Other schools do not want to hire a principal who does not read and follow policies, right? I agree with Your Honor that—I apologize for that. No, I apologize. Go ahead. I agree with Your Honor that had the statements the board made simply been that she didn't comply with the policies at the time, either for attendance or transportation, there wouldn't be stigma here, or at least the stigma wouldn't rise to the level of a constitutional injury. But that's not exactly what they said. What the title of the memo was and what was said in both the statements that were reported in the WBEZ article, which recounted the first meeting and other statements made by the OIG, and statements that were made in the second meeting where they read the OIG executive memo, those statements went even further, and they said that she was actively falsifying attendance data. The OIG specifically related it to previous widespread instances where there was widespread deliberate attendance fraud. And that is different. That is challenging someone's integrity, which they did.  And it's that injury that we've shown with instances when she applied for the Learned Charter Network, that it foreclosed her from her occupation. So the position that she applied for at the Learned Charter Network was director of operations, right? And I think for the academy group, she applied for assistant director position. There doesn't seem to be much in the record as to what exactly those positions entailed, what their duties were, what sort of qualifications were needed, whether she needed a principal's certificate to get those positions. Can you provide some of those details to me? What does a director of operations at the Learned Charter Network, what were the responsibilities of that position? I don't have the fullest of what that responsibility entailed, but I do know that for the academy group, I think as far as the qualifications go, it is in the record that someone with lesser qualifications ultimately got the job. Well, I guess that's not my question. My question is I'm trying to figure out why you believe the director of operations and the assistant director of position would fall within school administration as you have defined her occupation. Well, my understanding is that Learned Charter Network is a network of charter schools both in Chicago and elsewhere in the nation. And as a director of operations, she would be functioning as an executive in the operation of those schools. It's essentially like a superintendent for a large district is my understanding. So she wouldn't be operating for a particular school or a particular locale. It would be for the entire network. My understanding is that it was a job with the Learned Charter Network in general, not with a specific charter school in Chicago. And do you know whether someone who qualified for that position needed to have school administrator training, such as like a principal certificate or something like that? I don't know whether or not certification was required, but absolutely, working as a school administrator, being director of operations where you're overseeing numerous other administrators, most certainly would require the level of experience that Ms. Biggs had and other administrators have. It's a school. It's an education administration position. And what about an assistant director position? What did that entail? I believe it's also for the academy group. It is also a school administration position, although assistant directors, like assistant principals, often have very ad hoc responsibilities dependent on what the director needs. But in both cases, my understanding is that it is a you're administering either a school or a network of schools. And those are the positions that are assisting director in doing that. And that is reflected by who was ultimately hired for that position, which was a former CPS assistant principal, not a principal. So some someone who had no experience previously at the highest level within a school administration. I asked the question of whether Ms. Biggs is still working within her field. Is that a question of fact or law? I think it's a mixed question of fact or law. Well, actually, so I think her whether or not her current occupation is educational administration is can be considered a question of law. Well, obviously, facts support it, but like the details of what she actually does at SWAP. But my understanding is that the scope, it is not an administrative position. She is not working as a school administrator. She's not has no interaction with kids. She's working as a vendor that supports and provides services to schools. She, as the record shows, she tried to apply for a volunteer position at CPS so that she could volunteer as in connection with her duties at SWAP. And she's not allowed to do that because of the D&H. She's basically foreclosed from being on CPS property, interacting with any students because of that D&H. And is there any evidence in the record about who made the decision to release the inspector general's report and why that individual had the authority to do that? There is some evidence that the emails between Liz Kirby, the chief education officer, McDade, and the CEO, Jackson, all three of those are the only ones who were on that email. That shows the decision, at least that's the only record we have of that decision in paper. And that references discussions with legal and with comms, which is the communications team. But ultimately it is emails that Jackson has cc'd on and I think the reasonable inference is that she took part in those meetings that are referenced in those emails. And that is where the decision to release this was made. But that was only after your client sent a detailed email to 100 stakeholders or thereabouts, defending herself basically. And in advance of the first explanatory meeting that was called to explain the transition in leadership. That's correct. And we've addressed, I think, the unclean hands argument or this self-publication argument based on Olivieri. That is different from Olivieri, where Olivieri, there was no evidence that the city in that case had published anything about the results or any details. They didn't even say there was an investigation. The idea was that he would have to, he, I guess, supposed that it would ultimately be inferred or found out if he applied anywhere else. That's not the case here. When they called that meeting, before she sent that letter to the stakeholders, they specifically referenced that this was the result of findings of improper attendance practices at birth. It was listed in the letter that went out to the parents. Right, but she's admitted improper attendance factors. So there's no stigma associated with that when she's admitted that's what she did and that on its face isn't really stigmatizing. Right. Well, I think it is, but I agree that it doesn't rise to the level of necessarily the impropriety that we're talking about. I think that it's in the beginning when they sent that letter, they made it very clear that the focus and the reason of her termination and what was going to be discussed at that meeting was the OIG report and what the OIG found. And during that meeting, they referenced that it was about integrity, that they identified these improper attendance practices at birth. And took it even further by, again, saying that this was about her integrity, this termination was. So I think that she didn't necessarily raise this issue of whether or not they were accusing her of falsification. It was necessary, and we submit inevitable, that they would disclose that because of the response that was at the meeting where the public demanded it. And in that first meeting, they made the promise that they would ultimately release the OIG report so that the public could see that the findings they believed, which they argued were true. Ms. Biggs never got to publicly rebut that, and that's essentially why we're here today. Thank you. Thank you. Mr. Doyle. Good morning. May it please the court, I'm Thomas Doyle on behalf of the Board of Education in the city of Chicago. A couple of the questions struck me, and they struck me as going to what I regard as one of the key issues in this case, which is the limited time period and the limited scope of Ms. Biggs' job hunting to be a principal. One of the key pieces, rather, of her self-defined field of school administrator. Clearly, a principal is a school administrator. Recall the timeline here. It's June 29th that we fire her. There are two meetings that she has alleged that were a problem, July 6th and July – or July 9th, rather, and July 25th. She sued on September 10th of 2018, alleging just weeks after she had been fired that it was virtually – essentially, she was alleging that she had been denied her occupational liberty interest. What that requires, that kind of claim requires under the law of this circuit, she must prove that it was virtually impossible for her to gain work in her chosen field. The limited nature of her search as of the time she sued, that September 10th date, was – she clearly couldn't make that test. She stopped looking altogether for principal jobs by November of 2018, also an undisputed fact on this record. The limited nature of her search and the limited time of her search means that Ms. Biggs cannot satisfy the virtual impossibility test. You'll recall from the Robluski test – Robluski case, the formulation of virtually impossible is, did she suffer a protracted interruption or – let me get the phrase correct. It is a – did she suffer a protracted interruption or a permanent exclusion? And that's certainly not shown on this record, based on the limited nature of the search that she did. I'd also like to focus on one of the things that we spent some time on in the briefing that went unresponded to in the reply brief. We spent some time at pages 34 to 38 of our brief discussing how what the board said was not false. And we discussed the two areas that have been tossed around in this case as the areas of false statement of fact. One of them being this falsification issue, the other being integrity. We spent some time in the brief going through how there was ample basis for the board to say what it is that it said. That goes unresponded to. You look at the reply brief. The reply brief deals with this issue very briefly at pages 23 to 24 of the reply brief and just doesn't answer the evidentiary record. One of the things my colleagues just – my colleague just told you is that the board said via the inspector general report that Ms. Biggs had falsified records. That is, that sentence does not appear in the inspector general report. Falsification is on the title of that report. You can see the board's inspector general report. It is in the record at ECF 101-6. The description that my colleague gave of what is in there that is a direct accusation, he says, as to what Ms. Biggs did simply doesn't appear in that document. Rather, what that document does is it shows the board had policies. Ms. Biggs was responsible for knowing those policies. That fact is undisputed. She did not know those policies. That fact is undisputed. And her team at Burke School did not follow those policies. That fact is also undisputed. That is certainly true with the attendance documents, and that is also true with the student transportation policy. On this record, the board didn't say anything false. And on this record, Ms. Biggs cannot show that it was virtually impossible for her to work in her chosen field. I'm happy to discuss anything else Your Honors have on your plate or any other questions you have for me. But for the reasons that I've discussed today and the reasons covered in the briefs, we'd ask you to affirm the district court. Counsel, do you think that the district court's definition of what Ms. Biggs' occupation was was too expansive? I don't. And the reason I don't is because under the cases, they talk about have you been excluded from your field of work. There's ample cases that say you don't have a right to a specific job. She's working in the field of education right now. She's doing consulting work at a school in Burwood. So if she had a job as a private tutor, would you say that she was working in the field of education? I would. What if she was writing a book about education? That one might be harder for me. What if she was a radio commentator on educational policies? That one strikes me as too far. But I think if she's working with schools, she's working in the field of education. I do have a question. Suppose an employee knows there is something troubling in her prior employment file. So she prophylactically reveals it in interviews. Would that mean she can never file a deprivation of occupational liberty claim because she and not the employer revealed the information herself? There are ample cases that say an occupational liberty interest claim requires that the employer disclosed the information that made its way to the prospective employers. If the facts that you're imagining, Judge, if on those facts, the employer was always, I mean, the employer, the fire, for us, for example, the board, if the board had always been completely silent, there cannot be an occupational liberty interest claim against us in that circumstance, to answer your hypothetical. But doesn't that put employees in a bind? In other words, to protect a future legal claim, they can't disclose prior issues themselves. But they have to wait for the employer to disclose it in a reference check, at which point it will look as though they were hiding the information. Do you see my... I do. I guess I am not as sympathetic that all of the circumstances that you're discussing ought to rise to the level of a constitutional due process deprivation. That doesn't strike me as a due process problem in the situation you've described, even if it is not ideal for an employee. You know, it's really interesting because the way I saw it, the elements of deprivation of occupational liberty require public disclosure. It does not seem to require that the public disclosure is the only disclosure, or even the first disclosure. So why do you think it matters? Oh, that's a very good question, and I think it matters for a couple of reasons. One is, I think it matters because it helps explain what it is that happened here. The board gave a very limited letter. When the board sent a letter to the community that said Ms. Biggs has been replaced as the principal after an Inspector General investigation, there will be a meeting July 9th. That's all the board said. Ms. Biggs then starts emailing stakeholders at the school, trumpeting in this blast and extended self-disclosing email that the board said this, and the board is saying this, and the board is saying this. The board has said nothing of the kind as of July 2nd, as of July 3rd, as of July 6th, which were the dates of those emails. By the time the July 9th community meeting comes around, the community is saying, what is this Inspector General report? Because Ms. Biggs has started a brush fire. By the time the July 25th meeting comes around, the board is facing calls from the community. These are undisputed facts, calls from the community that we need to see the Inspector General report, and then the board releases it. All of it goes to explain what it is that happened here, and for the purposes of Monell, it certainly goes to whether the board acted with deliberate indifference to her rights. Because the board was careful with what we said, and then Ms. Biggs started an argument, and when we responded, she sued us. And just one last thing, the same question that I asked Mr. Fink, as to the question of whether she's still working within her field. Do you think it's a question of factor of law, or do you think it's mixed, as she does? I guess I had not thought about that before you asked that this morning. I think that's probably a question of fact, whether her current job at Southwest Organizing Project ought to be characterized as in the field of education or not in the field of education. And I say that because if I were a judge trying to sit through and weigh that question, I wouldn't look at cases. I would ask about the events, which suggests to me it's a question of fact. Does it matter? I don't know that it matters in this case. I mean, not the question of law, question of fact dichotomy, but does the characterization of her current job matter to the ultimate question about whether it's virtually impossible for her to find a job in her field? It matters on the very last piece of that sentence that you just said, which is what is her chosen field as to which it is virtually impossible. But even if the answer to the question about whether her current job is in her chosen field is no, does it matter in the ultimate field? I'm following your question. No, I don't think it matters in this case, because her search is so limited and so short. Thank you. OK. If you have no further questions, thank you, Your Honor. We'd ask that you affirm the district court. Thank you. Mr. Fink. Oh, has his time expired? My time's expired. You can have a couple of minutes to rebut. Thank you, Your Honor. We had a lot of questions for you. First of all, I just want to respond to one point. The idea that this is a self-defined field I don't think is accurate. Educational administrators is a very well-defined field. There are certifications, licenses that are required. She can't look outside the state of Illinois if she's not licensed as an education administrator in most jurisdictions. It's a big state. It is a big state. It's also a big school district. It's the fourth largest in the country. And so the fact that she's… She didn't look very far. OK. But she did look. And if that is a question of fact, we submitted something that… And she didn't look very long. She didn't look very long, but she did look. And I think the effect of the statements also, I mean, as the court has said, that whether or not she was stigmatized is a matter of degree. And that's the distinction between whether or not it's actually defamation or whether we're talking about stigmatization, the stigmatization test in this case. And to that, you can look at the actual statements that were made in addition to her efforts to show that those statements precluded her from or actually caused her this harm. She did that here. She found… She applied to positions that she was qualified for. Those educators, once they looked her up, Googled her name, the third hit was this article, which accused her of fraud, in which the board accused her of fraud. Board employees accused her of fraud. And that itself, we submit, is a question of fact for the jury as to whether or not that made it virtually impossible for her to find education or employment as an educational professional or as an education administrator. Yeah, all the cases which the board has cited in their brief on that point all involve cases where someone didn't look at all because they feared that they would be self-publishing in that case. And there was no real publication. That's a publication issue, really, on behalf of the municipality. Here, the municipality did publish it numerous times and published it publicly several times. Just really quickly, regarding the issue of whether or not we've identified these statements as false or which statements that were false, we, in our reply, thoroughly addressed which statements we're talking about here. And in our briefing, both in our reply and the summary judgment in pages, I believe it's 9 through 19 of the summary judgment brief for the plaintiffs, we went into great detail as to why those statements in the OIG report specifically were false. And in some cases, admittedly false by OIG investigators, the ones who actually prepared the report. They admitted that these statements were taken out of context in the executive memo, which was the summary of the report that was provided to everyone else. And so on that issue, we just feel there isn't too much to say that hasn't already been said. And it wasn't addressed by the court at all in its decision of summary judgment. And so we decided to focus on the issues, which this court is focused on today. All right, thank you. Thanks to both counsel. The case is taken under advisement.